Good morning, my name is Matt Belcher and I represent Joseph Maciasz, the Injun Worker. Mr. Maciasz had his vision removed when he took a nail in the eye on April 29, 2009. On that day he lost 100% of his vision. On that day he became entitled to a payment of statutory loss for that loss of vision. He received his first TTD check on June 7, 2009. He got his second TTD check on August 24, 2009. Another 10 weeks later, his first payment for the statutory loss of his vision was August 10, 2010. It was 467 days after he lost his vision. On the 120 days after Mr. Maciasz was removed from his record of job duties, 7110.10 required the filing of a vocational rehabilitation plan by the employer. That plan was not filed. The petitioner noticed the case up for 19B, multiple penalties petitions, multiple 19Bs. Each time there was a promise to bring the case to compliance and the promise just fell through. The commission goes on to adjudicate permanency in the proceeding under 19B and that's part of your appeal, right? Yes. Yes, Justice Hudson. And what would have happened is we filed the 19B. We thought we brought the Lisa Helmer, who was the CRC, who's the person since 2005 amendments of the Workers' Compensation Act to be required to have a CRC, which is a designation from a vocational rehabilitation counselor who's been certified that can come off a testimony regarding vocational opinions. Now, this seems to be, excuse me for a second, but this case has obviously some very tragic aspects to it, granted. But it appears that when you took the appeal challenging the commission's decision to give the permanency award in the section 19B hearing, it appears that you did not raise that issue with the commission. Is that correct? The permanency aspect? Yes. That they erred with the permanency. Did you raise that before the commission? You know, Justice Hudson, to be honest with you, I don't know the answer to that question. And I would submit, however, that the case law suggests that a person can't really waive that issue. I can't waive something and then empower the commission to have some sort of statutory authority that's not granted to them in the law. But I appreciate waiver is the problem. Waiver is a forfeiture. It's probably a little bit different. But anyway, it looks like the record reflects that the statement of exception that you filed with the commission when seeking review failed to mention any issue about the permanency. Are you aware of that? I don't disagree with what Justice Hudson said. So you don't see that as an issue? I don't think that any action or admission on my part can somehow empower the Workers' Compensation Commission with an authority that's not granted to them pursuant to the act. The case proceeded as a 19B. At the respondent's insistence, nature and extent was the box's checkmark. The arbitrator indicated, is there an agreement whether or not nature and extent is in dispute? And there was no agreement, so the arbitrator concluded that, well, that must be in dispute then. And I disagree with his characterization of it. I just want to follow up with something that Justice Hudson asked you, and that is in regards to the statement of exceptions and whether or not the commission could do what it did. Are you suggesting that the commission's decision was void because it did something it was not empowered to do and therefore could be attacked at any time along the lines of what perhaps a circuit court's decision that's void may be subject to attack at any time? Is that what you're saying? Any award of permanency, according to my reading of the case law, indicates that any award of permanency subsequent in a 19B is in fact void. I think Thomas says that. And that you don't have to raise it before the commission. You can attack it at any time. If it's void, then I can attack it at any time. Well, why would you not attack it before the commission? I think that we were hyper-focused upon the notion of the filing of the vote plan and the payment of the maintenance. What had happened is this case proceeded to trial 644 days after the accident. There's no vote plan filed. It hadn't been filed after 120 days. So there's a series of delays in this case that worked to disadvantage my client. In fact, they sought to be obstructions. And those obstructions then caused the employer to say that we somehow hadn't proved our case. But the truth of the matter is that Ms. Helmer came to testify as to Mr. Matius's loss of capacity to go back to be a carpenter. And, you know, I don't want to engage in Talmudic micro-exegesis over here, but do you need a piece of paper that says that... Is that a legal term? No, I kind of made that up. There's a shorthand in the Workers' Compensation Commission that you have to have an off-work slip to get TTD payments. But we know from the direction of the Illinois Supreme Court that the proper analysis is, has the person reached maximum medical improvement? That's really the only inquiry. Whether they have a scrap of paper from a doctor that says that they're off work isn't as important, the Supreme Court guides us. It's whether or not the person has reached maximum medical improvement. If they haven't reached maximum medical improvement, they're entitled to the payment of TTD, subject to certain... They could have been offered a work. But that's the general rule. The general rule is that you have to have a piece of paper. There's no note above. There's no indication of an off-work note in the Workers' Compensation Act. And likewise here, we have not an opinion from Dr. Trestman. We have an ambiguity from Dr. Trestman. They stopped paying maintenance benefits. Despite Mr. Montius engaging in a good faith, diligent job search, they stopped paying him on June 4th of 2010. On June 10th, a week later, after they had already stopped paying him, there's some sort of cryptic scrap of paper that says, Mr. Montius may return to work. Must wear safety glasses. That's been transmogrified into some sort of a vocational opinion that Mr. Montius hasn't sustained any loss of his earning capacity. Who's that helmet? The helmet is the CRC. Did he indicate that if Tresley was correct, then the claimant was capable of returning to work in his previous position? Ah, but that's not the inquiry. The inquiry is has he lost his earning capacity. The Supreme Court guides it's a national key that a claimant has been deemed entitled to rehabilitation where he has sustained an injury, which caused a reduction in his earning. I also would rather say a claimant was capable of returning to work and would have no occupational impairment and subsequently no wage loss exposure. Well, that's an hypothetical opinion. So one thing we, one thing the CRC is careful to do is not. If a person is capable of returning to their pre-injury employment, how can you say that they've lost income or lost their ability to earn income? So one of the bowl basketball players tears his ACL. Dr. Cole does a great job repairing it. He's released back to full duty. Is he able to earn, does he have the same earning capacity that he did before? What happens if it's his third surgery? He's still released to go back to work. Does he get the same earning capacity? If he's getting paid the same amount of money, he certainly does. But I'm just, from a philosophical, from a philosophical. I'm not engaging in philosophy. The guy's a carpenter. Carpenter. Carpenter. Pardon? Carpenter. Carpenter, I said. Is that correct? No, I'm sorry, Justice. He's a carpenter. Carpenter. The guy's a carpenter. And carpenters get paid X number of dollars an hour. He loses an eye and is determined that he can go back to work as a carpenter. Why did he lose his earning capacity? Because, here, and it's from the actual trial, my question to the CRC, the person who has, who the act guides us, has the expertise in order to offer these opinions. Do you have an opinion as to whether or not Mr. Matras can return to his previous life at employment? Objection. Sustained. Our attorney goes on to say, you're asking for an opinion as to whether or not he can return to employment. I don't think she can render that opinion. Me, even though I've laid the foundation that she's a certified rehabilitation counselor, the arbitrator, yeah, and I don't think she can render an opinion as to whether or not he can return to employment. Just because she's a certified vocational counselor does not give her the expertise to render that opinion. Subsequently, her report was offered into evidence, and in the report, Ms. Helma, in fact, does indicate that he's lost access to his usual customary employment as well as also a reduction in his earning capacity. And the second part of nationality that we look at here says that there's evidence that rehabilitation will increase his earning capacity. I mean, I must be mixed up here because my notes indicate that Helma, the claimant's vocational rehabilitation expert, opined that if Dr. Tressley was correct, then the claimant was capable of returning to work from his previous employment and, quote, would have no occupational impairment and subsequently no wage loss exposure. Well, I think she was responding to a hypothetical question. And I think that I'm not saying that your notes are incorrect. I'm saying that she was asked a hypothetical question. Did she say that or didn't she? I think she did say that. Okay. And the commission didn't care much for Dr. Foyer's opinion, did they? Because you're correct. And the reason why is because they indicated that that was the first indication that he had lost depth perception, but that's an inaccurate reading of the medical records. In fact, the second visit to the eye surgeon at North Shore indicated that Mr. Botches had a lack of depth perception. July 10th, Dr. Tressley released him and returned to full duty? July of 2010? I would disagree with that characterization. He didn't do that? He did not. What did he do? Indicated on a scrap of paper that may return to work, must wear eye protection. Pardon? Must wear eye protection. Yes, Justice. Any restrictions? No, that's the extent of the note. Okay. So he didn't put him on any restrictions, said he could go back to work, he had to wear eye protection. May return to work, must wear eye protection is not an opinion that he can return back to being a carpenter. It's an ambiguity that needs further clarification. And so what we did is... Commission didn't think it was an ambiguity that needed clarification. And that's their life there. So what we did is we asked Ms. Helma to visit with Dr. Tressley to get a clarification, because Mr. Botches doesn't speak English, to get a clarification as to whether Dr. Tressley understood that he was a carpenter and what his symptomology was. That authorization was denied. The employer, first of all, he lost his eye. He tried to go back to work at the employer. The employer says, we're not going to hire you because you lost your eye. And then they go on, then they say, well, you haven't lost access to your earning, you haven't had a diminution in your earning capacity, but we're not going to hire you. Then we have this scrap of paper that comes a week after they stop paying him, and it says may return to work. Ms. Helma says, well, wait a minute, I've got to go talk to Dr. Tressley. That visit wasn't authorized. There's an affirmative obligation to pay and provide. And I submit to you that 8A requires the employer to pay and provide to allow Ms. Helma to gather more information. She indicated that she needs to know what exactly these terms of may return to work are. But there was a roadblock put in our way. And then they used the roadblock to then say, you have insufficient information as to what she can or can't do. I'm curious about this hypothetical that you said Helma responded to that has been discussed here. What was that hypothetical? Ms. Helma is careful not to disagree with the medical doctors. My ears aren't going to catch up with the speed of your speech. Sorry. So it's my recollection from the trial, now this is going back to 2011, I believe, is that she was asked a hypothetical that if Dr. Tressley is correct that he can return back to work with no restrictions, would he sustain a loss in his earning capacity, to which she responded, no, he wouldn't. So a commission can't consider that answer? I think that the hypothetical is inaccurate and incomplete. I think that we're trying to modify this scrap of paper into some sort of opinion within a reasonable degree of medical certainty that this person can go back to work. Okay, so all we have from Dr. Tressley was this note? Scrap of paper. It's literally on a prescription pad, may return to work. And it was on a date that he did not see. So you're saying that the hypothetical added to that note. Yes, Justice. And so her response is to something that's not in evidence? Yes. Is it that simple? It's that simple. If you ask a CRC if the doctor returns you back to work full duty and he can go back to his old job, do you have any loss of earning capacity? Did you object to the hypothetical? I don't remember, but if you read the transcript of this. Well, he didn't object to it. What I'm curious about is how we're to accept the evidence that comes in without an objection. You're saying here on appeal we basically can exclude evidence? I don't mean to say that. What I'm telling you is that Dr. Tressley performs procedures just like the author performs procedure. He never took into consideration what his job duties are or what his restrictions are, and he never saw Mr. Montes on the day this piece of paper was written. We're taking one scrap of paper and saying that this means that this carpenter who's lost his eye, who the employer won't take back, who the carpenter's union says is not eligible for rehire. It's saying that that scrap of paper from a medical doctor somehow diminishes all the actual vocational evidence. Let me just ask you something. We're spending a lot of time on the weight of the evidence, which is one of the commission's problems. Anyway, your other main issue that we never seem to have gotten to was the argument the commission erred when it held a claim and failed to prove the condition of ill-being with regard to his right eye. It was connected to the work accident. So succinctly tell us in the minute or two you have left why the commission erred in that ruling. No one made a claim for any diminishment in his right eye. The loss of death perception had to do with the removal, with the traumatic inoculation of his eye. So there's a misperception that we're trying to prove that he had some sort of diminishment of his right eye. And so that's why. What did you appeal? Did you appeal from any findings, any decision on the right eye or no? No. This case has nothing to do with the right eye. Okay. That's what my point is. I don't know what you're talking about. The man got a nail in his left eye. It was inoculated surgically. I thought you were claiming the claimant was claiming loss of death perception. As a result of losing the left eye. Okay. The loss of death perception can only be experienced through the remaining eye. Okay. Well, I accept that. But Ms. Hummel, one is. . . Counsel, maybe I'm missing something, but this is your group, isn't it? It is, Judge. The commission's finding that, how does he pronounce his last name? Macias. Macias' right eye condition of ill-being is not causally related to his accident. It's against the manifest weight of the evidence. Didn't I just ask you that? You just asked me that and you said you're not. . . You said no. It's not an issue in the case. It's not an issue in the case. The whole section of your brief on it. Are you following your brief at all? This is what I'm trying to explain. Well, explain what's in your brief for us. Sure. There was a finding that I failed to prove that his right eye had any diminishment. I envision the loss of depth perception as being resulted from the enucleated eye. The commission interpreted it as that I needed to prove a diminishment of his non-enucleated eye. What's that got to do with the issue you framed in your brief that we reviewed? You're telling us now that what you put in your brief isn't really your position. No, no, no. I think you misunderstand. I'm looking. . . He just read your brief. I understand. You didn't misinterpret anything. I don't want to argue with you, Judge. That's for sure. So this is my position. The Workers' Compensation Commission said I failed to prove any disablement with the good eye. My position is that the disability and its loss of earning capacity arises out of the loss of the left eye. The left eye with injury is blindness. So when you talk about depth perception, how is that to be experienced other than through the vision of the right eye? Okay. I appreciate what you're saying. I understand that it's . . . Can I ask a question here? What you're saying, as I understand it, is that because of the loss of depth perception, he should have been compensated as man as a whole or some other concept. I wasn't lost. I never had the opportunity to bring that evidence in because it was a 19B. So is that what you're saying? That's part of my brief. So let me ask you a question. You weren't asking for compensation specifically for the other eye. Right. You were saying because he has that loss of depth perception, he now experiences a loss of earning capacity. Yes. There's a report he should be compensated. If I have . . . If I have a branch or whatever. I'm a basketball player. I have my left leg chopped off. In order to prove that I've lost access to my usual customary occupation as a basketball player, do I have to show a diminishment in my right leg? The commission said I have to show that there's something wrong with my right leg. Justice Hudson, that's what I think the misunderstanding was. I don't mean to . . . What I'm trying to say is that if I've got my left leg chopped off and I'm a basketball player, I don't have to show you there's a diminishment in my right leg. Let me frame the problem I was having with the argument. I asked you a question as to the issue you raised on appeal. You implied back to me that it's not an issue in the case. I misunderstood the question, and I apologize. Okay. I've got a whole section of the brief here, and nothing that you've just argued is in there. The only thing that you're arguing here is that it was against the manifest way to the evidence to find that his current condition of ill-being with respect to his right eye is not causally connected. His visual problems are documented. It's certainly reasonable for the commission to require diagnostic tests. A depth perception actually of corrective nature and extent of disability. In this case, 19B, the finding that he did not report problems with depth perception after he was released from work by Tressler for his medical evidence, and then you talk about right eye. It certainly is an issue in your brief. I made the argument that my left leg was chopped off. I don't want to hear about left legs. It's easier to visualize it. Pardon? It's easier. It's easier with the eye. I know. I'm kind of simple-minded, so I can't. Well, I'm extremely simple-minded. So the gentleman lost his left eye. We understand what you're saying. I understand what you're saying. You don't have to repeat it five times. He asked you a question of did you raise the issue in your brief. You said no, and I just trumped you and read your brief to you. That's all that this is about. When you get asked a question, answer it honestly. I just misunderstood the question. I don't know how you put it, but that's all right. Counsel, your time. Oh, thank you. You'll have time to reply. Thank you. Counsel, you may respond. Good morning. May it please the Court. Counsel, Jeff Goldbergen on behalf of my respondent, Koja Remodeling. I think this case is actually rather simple, and the issue that was just being discussed is very clear. A depth perception can only be perceived through the remaining eye. Can you clarify once and for all, is this an issue in the case or not? Did he raise it in the brief or not? Well, I raised that, well, the work capacity and his ability to return to work, that there is no issue with depth perception. If I didn't reference specifically a right eye condition not being a depth perception. I didn't say you. He raised it in his brief. I don't believe I do not. Well. He didn't take an appeal from that issue? He took an appeal that there was still a diminishment of sight capacity. So. In his other eye? In his other eye. Okay. Yes. All right. Yeah. So his argument is basically that there was still a diminishment of the ability of Mr. Macias to be able to perceive depth perception. I think it's very clear. I think it was elaborated in my brief that Dr. Tresley of the Feinberg Medicine University of Northwestern University, that here is a well-trained ophthalmological surgeon who treated, took him under his care, kept him off work when he needed to be kept off from work. And at the end of that treatment, when the condition resolved in terms of the left eye and the surgical procedure was performed, he made it very clear that on July 9, 2010, he issued a very clear, and the petitioner keeps on referring to it as a piece of paper, but it is what is utilized all the time before the arbitrator and the commission to make determinations as to return to work, he states, Dr. Tresley may return to work and must wear safety glasses. Dr. Tresley was very aware that Mr. Macias had, in fact, performed physical labor. He made a history that he suffered his eye injury from a nail gun while at work. There is no restriction here, no concern by Dr. Tresley to even return using a nail gun. Well, we didn't get to this during opposing counsel's time, but Tresley performed surgery in February of 2010. The accident was April of 2009. Is that right? Yes. And then in a follow-up post-surgical exam in March of 2010, he documents that it's a normal examination with regards to the right eye. Is that right? Correct. Is that sufficient support then for the commission's decision? I believe so, and the commission can weigh the evidence. We defer to the commission's ability to take in and incorporate all the various medical opinions, as well as, of course, the testimony of various witnesses, and they were clearly able to determine that there was not any problem with Mr. Macias' ability to sign. His medical records indicated that the claimant never made any depth perception complaints, correct? Correct. And what was trying to be elaborated upon was that not only Dr. Tresley, there was also an operator list, and that was Dr. Nichols. She works with Dr. Tresley. She's an M.D., so it's not just like an optometrist. She's an M.D., and she saw him for approximately eight months from, I believe, all the way through January of 2011, and for the eight months preceding, would see him admittedly regarding how that prosthesis was working out for him, but she notes no problems, no problems, and at the very end, she notes no complications, and she even says to Mr. Macias, if you have any problems, let me know. If there was a depth perception problem, if there was difficulty with him just being able to conduct himself with his sight, there's no doubt she would have referred him back to Dr. Tresley or some other provider. I also note that another doctor who referred the petitioner to Dr. Tresley, and his name is very similar in sounding. It's Dr. Masai. He did, in fact, in the first week, did make a quick reference that there was depth perception, and that was just a quick note in the first week after the injury. Subsequent, there are examinations which, again, report that the petitioner, in terms of his sight and his right eye, is doing well. In fact, at one point in September of 2009, it's 20-20 vision in the right eye, and there's no complications, no problems. Well, you know, there's the question of the chase. The issue is whether or not there's sufficient evidence in the record to support the commission's finding, correct? Yes. Let's get to the other issue he raises, which is a little more interesting, perhaps. He says the commission's adjudication of permanency in a proceeding under Section 19B is void, and it could be attacked at any time. What's your response to that argument? First of all, it's not void. It was appraised before the commission, as Dooley noted. I think it's waived. If it's void, you can't waive it. Right. If you can't waive it, then my argument is that in the cases that are cited, this issue was clearly presented at the time in terms of the nature and extent of the condition. I believe there's a case of National Freight Industries that supports our position that as long as MMI was reached, and you can prove that MMI was reached and there was no request for additional medical care, and I'm not talking about ameliorative care but curative care, that you needed additional care to cure a particular condition, that the commission does have the authority to determine what is the extent of this particular disability. I want to note that there was, in fact, statutory loss payments made for the loss of the object. So there was recovery. It was just up to the amount of the statutory loss. And you have no case law that specifically authorizes this procedure, correct? I have no case law, but I'm distinguishing the case law that does discuss this. The Thomas case from 1980, which I think is in terms of its ability to incorporate what we do now with the Act, I still think that I can discuss it and incorporate it and distinguish it because in that case, the petitioner never had an opportunity to present. There was no evidence that the petitioner had reached MMI. In fact, the petitioner in that case was found to be still disabled, and medically, there was no medical testimony indicating that the petitioner could return to work. In this instance, if it is in the province that the commission determined whether additional TTD is warranted, additional evidence of maintenance is warranted, and as such, we have a petitioner who is now before the court with a full-duty release, and if there's any additional benefits that are deemed warranted, the commission can make that determination. And they did. The amount of PVD that was paid pursuant to the statutory loss was sufficient. So the short answer in sum of that long litany is that in the context of a 19B, carrying the commission is authorized to give a permanency award. As long as there is MMI and there's no request for additional future care, that's curative. Well, the issue here was he was asking for voc rehab, and the arbitrator said you're not entitled to it. And so is this what happened? The arbitrator said you don't get voc rehab, so everything else is decided, might as well go ahead with permanency? Yes, because there's no need. I mean, we could remand this and have the commission determine, yes, the statutory loss is sufficient, because they've already said so by not going further and saying that there's some type of person as a whole award or loss of eye award that would provide additional permanency benefits for the petitioner. In this instance, there's no need for vocational rehabilitation because you can return full duty MMI status. And the vocational, and I think we've discussed this already, the vocational rehab expert admitted that if Dr. Tresley is correct and he can return full duty, there's no diminishment in wage capacity or diminishment of his ability to conduct his training. So you're saying you're all in, let's turn the cards? Yes, and it's interesting to note that in their decision, the commission did not refer it back to the arbitrator under Thomas. There is no referral back to the arbitrator, which would happen in a normal 19B. It would always go back for additional awards of TTD and for awards of permanency. In this particular case, it was not remanded back by the commission, which appears to be, as Justice Holder said, they said, you know, it's all in. It's over. And if you look at the arbitrator's decision, he actually doesn't characterize it as a 19B decision. He just states arbitrator's decision. I think, again, if MMI is established, there's no additional medical care required, and we have a clear, again, by weighing the difference in competing medical opinions, Dr. Tresley's opinion was found to be the more credible over Dr. Forry's. For all the reasons that I've elaborated in my brief, Dr. Forry's only seen him once. He's not an ophthalmologist. We don't know what testing he did to come up with this conclusion about depth perception. The commission was able to see he, the petitioner, received these PPD statutory loss benefits, and that was sufficient. And if they felt that there was additional amounts that should go on top of that, they could have done so. And I don't think procedurally it's in contravention of the Act, and particularly I'm referring to the National Affraid Industries, the most recent case from the Fifth District that discusses this issue because of the finding that MMI was reached and no additional curative medical care was needed. Thank you. Thank you, Counsel. Counsel, you may reply. This matter proceeded to hearing on a 19B. There was no other motion pending besides incidental 19B motions such as the petition for penalties. This isn't as the old basketball court said, you gambled and you lost. This is, I didn't have the notice of permanency, I didn't have the opportunity to present any evidence as to permanency, I didn't have any awareness that permanency was going to be adjudicated. The question, I, our vocational counselor, to come testify that he needed, that he was a candidate for voc rehab, he needed voc rehab, voc rehab would increase his earning capacity. Mr. Matjes testified as to that he tried to return back to the employer, and they rejected him because he lost his eye. He testified as to his job search, trying to return back to his employment. The CRC testified as to that he had no transferable skills, he doesn't speak English, he was a good candidate for voc rehab because it would increase his earning capacity. This is, this is the trial that's taking place. So are you saying in essence you were blindsided by the ruling on permanency? I had no notice, I had no notice that it was going to adjudicate permanency, and I had no opportunity to bring any witness or evidence to address the issue of permanency. My 19B was for, to get penalties for the nonpayment of statutory loss. There's a well agreed year that there was, that no, no statutory loss was paid, when we know it's due immediately. There was no vote plan filed pursuant to 7110.10, despite 120 days going by. I wanted that vote plan filed, which this Court has said is mandatory. It's mandatory. It wasn't filed, I brought a vote counselor in to try and get it. What does Mr. Matjes have to do to get his vote plan? The vote person came, he had an opinion from the medical doctor, he gave his own testimony, and they had a scrap of paper. And that scrap of paper says may he return to work. May he return to work. And what we're saying is this man is now on his own. Because may he return to work has now been transmogrified into it's an opinion, he hasn't lost any earning capacity, he can return back to his usual profession. There's no cases precisely on point as to whether or not the commission has the legal authority to do what they did. We have no cases to cite to us. I think it's in the brief that Thomas, for example. You mean as far as the piece, the. . . Well, what does it say in the context of the 19B? Well, I think that the, I think that the act itself tells you what it can do. 19B says it cannot in the act. That's not the question I was asking you. Do you have a specific case that says they can't do it? Just Thomas and his project. Let me ask you another question about that. As far as what the record shows, at any point at the arbitration proceeding, did the employer take the position that the arbitrator should go ahead and award permanency? I mean, was it, I'm just trying to find out, was there ever anything that happened or did it just appear the arbitrator's decision? No, the same as we heard from Mr. Goldberg this morning. It's his position that he's at MMI, he doesn't need more medical treatment, let's get the case resolved. So it was argued. That's what he said. He argued it, but I didn't have the, I had no notice or opportunity to present evidence to that. And 19B specifically says you can't adjudicate nature of expense. So if we accept that the Workers' Compensation Commission is an administrative body with statutorily delegated authority and powers, that's not a power that they have. On the manifest weight issue, going back to the death perception issue, you know, when I read this case intuitively, it would seem to me that there would have been some death perception issue in an individual that has lost vision in one eye, and a carpenter especially who's doing work within arm's reach, that that would be manifested. But was there any evidence that he was having that difficulty? Is there any evidence in the medical record that he did suffer from death perception issues? Yes. The second visit to Dr. Mazzai, actually the main treating ophthalmologist, indicated from the second visit that he had death perception issues. And that was before the surgery for the removal of the eye? Yes. Anything after that? Yes. Dr. Forish, who indicated that, in fact, he had no death perception, he shouldn't go back to that job. Dr. Forish, F-O-R-Y-S, same opinion. So the first note? No. I mean, were there complaints noted by the claimant to a physician that he was suffering from death perception issues after the surgery? Yes. The one visit to Dr. Forish where Dr. Forish found that there was a problem with death perception. So we have at the beginning and at the end, that's the last medical visit. Ms. Helmer wanted to get further clarification from Dr. Tresley regarding that piece of paper. It wasn't authorized. There was a roadblock and there was an obstruction. We were unable to get any clarification of what that meant. I filed a 19-B to get that growth plan filed, get the payment of maintenance, because the man is doing a good job search. He's entitled to the payment of maintenance incidental thereto. It wasn't being done. The emergency room bill from Dr. Tresley for the room of the eye wasn't paid on the day of the trial. Okay. Thank you, counsel. Thank you. Your time and replies are up. Thank you, counsel, both, for your arguments on this matter. It will be taken under advisement and a written disposition shall issue.